IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,

      Plaintiff,

v.                                 No.  1:12-cv-01315-RHS-KBM

LONE STAR TRANSPORTATION, LLC,
a Texas citizen, and RAFAEL MENJIVAR,
a Texas citizen,

      Defendants.

## UNION PACIFIC RAILROAD COMPANY'S FED.R.CIV.P. 37 MOTION FOR SANCTIONS FOR DEFENDANTS' DISCOVERY VIOLATIONS AND BRIEF IN SUPPORT THEREOF.[1]

**I.**

## UNION PACIFIC RAILWAY COMPANY'S REQUEST FOR SANCTIONS.[2]

Pursuant to Fed.R.Civ. P. 37, Plaintiff Union Pacific Railroad Company (hereinafter, "Union Pacific") hereby moves the Court to enter sanctions against the Defendants for their discovery violations committed in this action.  This is not a case in which Defendants seriously can contest their negligence or contest that Union Pacific incurred substantial damages.  Rather, it appears to Union Pacific that Defendants have engaged in the litigation conduct that is the subject of this Motion to attempt to avoid punitive damages.  *See* JSR [Doc. No. 18], Second Amended Complaint [Doc. No. 46].  Instead, their litigation conduct provides even greater, and admissible, proof that punitive damages are appropriate.  Sanctions are required because Defendants have provided false, evasive, and incomplete disclosures, answers, and responses to

---

[1] Defendants oppose this Motion.
[2] Plaintiff will also be filing an opposed motion for page limit extensions for both this Motion and Brief and exhibits thereto.

Plaintiff's written discovery and to deposition questions. Union Pacific discovered this on May 23, 2013, upon counsel's return from Court-ordered Lone Star depositions in Houston, and upon counsel's receipt and review of 317 pages of Lone Star documents that El Paso Energy Company (hereinafter, "EP Energy" or "EP") produced to Union Pacific on May 22, 2013 pursuant to subpoena. Hereinafter, these are referred to as "EP documents." Defendants concealed and failed to disclose these documents and the facts shown therein in their responses to Union Pacific's written discovery and in their deposition answers. The Concealed Facts demonstrate Defendants' knowing failure to provide discovery within the scope of Rule 26. Hereinafter, the facts disclosed by the EP documents are referred to as the "Concealed Facts." Union Pacific identifies the EP documents, referenced by Tab number, in Exhibit A-1; and it provides a more extensive description and narrative of the content and meaning of selected EP documents referred by Tab number in Exhibit A-2; and attaches copies of the Exhibit A-2 selected EP documents in the Appendix to Exhibit A-2. *See* Exhibit A-1; Exhibit A-2, Exhibit B-1 (Chart of Lone Star's Responses to Union Pacific's Requests for Production That Fail to Identify EP Documents or Other Documents Disclosing the Same or Related Facts); Exhibit B-2, excerpts of Lone Star's Responses to Union Pacific's Requests for Production; Exhibit C-1 (Chart of Lone Star's Answers to Union Pacific's Interrogatories Verified by Donna Stone That Fail to Disclose Concealed Facts Referred to in EP Documents); Exhibit C-2, Excerpts of Lone Star's Answers to Interrogatories; Exhibit D, Excerpts of Russell Powers Deposition; Exhibit E, Excerpts of Russell Powers Rule 30(b)(6) Deposition; Exhibit F, Excerpts of Rafael Menjivar Deposition; Exhibit G, Excerpts of Rafael Menjivar's Rule 30(b)(6) Deposition. Additionally, Defendants' failed to provide a log of privileged and work product protected documents and thereby have

2

waived those claims as to all documents created prior to the date and time the Complaint was served on Defendants.

Sanctions also are required because the May 21-22 Houston Rule 30(b)(6) depositions establish that Defendant Lone Star failed to prepare and produce its corporate representatives as was required by this Court's Revised Scheduling Order [Doc. 39] and by Fed.R.Civ.P. 30(b)(6), in response to Plaintiff's Rule 30(b)(6) Notices.

Defendants' discovery violations have prejudiced Union Pacific.   Had Defendants complied with their discovery obligations, Union Pacific's strategy, timing, deponent selection, Rule 30(b)(6) topics, and deposition questions would have been entirely different.   As it is now, Union Pacific is having to start over in deposition and in other discovery in material respects. The Court's sanctions should be fashioned in part to remedy this prejudice.

The Court, accordingly, should sanction Defendants.  *See, e.g., Tom v. S.B. Inc.*, Case 1:10-cv-01257-LH-WPL (D.N.M. February 10, 2012) (Lynch, W.) [Doc. No. 81 at 8-12][3] and authorities cited therein, *Skyline Potato Company, Inc., v. Tar-O-Marketing, Inc.*, 2012 WL 3150385 (D.N.M. July 30, 2012).   Union Pacific requests that the Court enter its Order as follows.

1.     The Court should order that:

(a)     Defendants promptly shall produce for renewed depositions in Albuquerque Russell Powers (Lone Star Houston Terminal Manager) and Rafael Menjivar (the Lone Star driver, terminated in December 2012 or January 2013), whose depositions Union Pacific initially took pursuant to the Court's Revised Scheduling Order [Doc. 39] in Houston, Texas May 20-May 22, 2013.

---

[3] In addition to *Tom*, other recent decisions from New Mexico are instructive.  *See, e.g., Santa Fe Trust, Inc. v. Standard E&S*, First Judicial District, State of New Mexico, D-101-CV-2011-00751 [Order for Sanctions and Judgment], attached as Exhibit H and Exhibit I.

(b)     Defendants promptly shall produce these witnesses for renewed depositions in Albuquerque, New Mexico, at Defendant Lone Star's cost; and Defendant Lone Star shall pay Plaintiff's counsels' attorneys' fees and costs for these re-depositions.

(c)     The time spent in the initial depositions of these witnesses shall not be calculated or considered against Union Pacific's deposition time for the re-depositions of these witnesses, nor shall the earlier depositions be counted against Union Pacific as separate depositions.

(d)     If subsequent discovery establishes that the other three May 2012 Houston deponents (Felipe Alas, Robert Lugo, and Erica Perez) had knowledge of the Concealed Facts, Defendant Lone Star shall also produce them in Albuquerque for re-depositions, subject to the same requirements and conditions set out in Paragraphs 1(b) and (c).[4]

(e)     Defendants also shall produce on an expedited basis in Albuquerque for deposition Lone Star employees:

(1)     Billy Sherman (a Lone Star employee who is believed to have been aware of the Lone Star convoy or convoys discussed herein and who was aware of possible overloading before the Menjivar tractor-trailer left Texas, and who was involved in investigating aspects of the claim, the load, and damage after the Incident). *See, e.g.,* Appendix to Exhibit A-2, Tabs 6, 9, 14, 16.

(2)     The other Lone Star dispatchers and all other Lone Star employees who communicated with any of the drivers of the Lone Star twelve trucks in the convoy or convoys, or with other persons, about, *e.g.*, their routes and course of travel and "ETA's," and/or about "bad weather" and road conditions; and the "State Police . . . shut[ting] some [roads] down

---

[4] Union Pacific, based on what it knew at the time, considered these to be minor witnesses; their combined deposition times total only approximately 3-4 hours, and should not count as more than one deposition, in any event.

4

due to road conditions," and the "fin[ing] due to weather" of Lone Star drivers in the convoy or convoys in New Mexico, and about alternative routes to avoid U.S. 285 and I-40 in New Mexico, between December 12 and 31, 2012. *See, e.g.,* Appendix to Exhibit A-2, Tabs 10, 12, 13, 15.

(3)      The Lonestar employees who can testify about the substance of Paragraphs 1(e)(1) and (2) and about Rotaflex and other shipments to EP Energy, the convoy or convoys, and the permits issued to and the routes taken by each of the convoy drivers, and about alternative routes, and about the documents relating to those topics.

(4)      "Freddy," believed to be Freddy Curtis James, a Lone Star dispatcher believed to be involved with dispatching one or more relevant Lone Star tractor-trailer units involved in the convoy or convoys and in investigating facts concerning the loads after the Incident.

(f)      Defendants also shall produce on an expedited basis for deposition in Albuquerque one or more witnesses as may be necessary to testify fully about the substance of the "all day event / meetings at corporate office" related to this Incident and associated claims and issues that was held on Thursday, December 20, 2012, and any discussions about this Incident that occurred that day, and the identity of all participants and all documents utilized in that meeting or created relating to that meeting. *See* Appendix to Exhibit A-2, Tab 19.

(g)      Defendant Lone Star shall produce Tex Robbins of Lone Star on an expedited basis for deposition in Fort Worth, Texas. *See* Appendix to Exhibit A-2, Tabs 19, 37, 41, 42, 43, 51.

(h)      Defendants immediately shall produce to Plaintiff all documents that conform to those produced by EP Energy to Plaintiff pursuant to subpoena, represented by Bates numbers EPUP0000001-EPUP0000317.

5

(i)      Defendants immediately shall produce all documents, including in native file format, related to those EP Energy documents referred to in the preceding paragraph or to the subjects addressed or disclosed therein, and also provide full supplementation to Plaintiff's Requests for Production Nos. 29, 39, 42, 43, 58, 68, 77, 78, 80, 98, 140, 142, 143, 153, and 177.

(j)      Defendants shall produce on an expedited basis for deposition in Albuquerque all additional witnesses necessary to testify about the documents referred to in Paragraphs 1(h) and (i) and subjects addressed therein.

(k)      Defendants shall identify and produce on an expedited basis for deposition in Albuquerque all other Lone Star drivers and co-drivers who may have knowledge within the scope of Rule 26 related to the convoy or convoys identified in the EP documents.

(l)      Defendants shall produce on an expedited basis for deposition in Albuquerque witnesses to testify as to why Defendants failed to provide the Union Pacific discovery requested, how such failures occurred, why Defendants supplied the false and misleading discovery responses and answers that are the subjects of this Motion, and to testify about the identity of Defendant Lone Star's officers, agents or employees who are responsible for this.

(m)      Defendants having failed to provide a log of assertedly privileged or work product protected documents (while still having asserted the privilege in certain discovery responses), have thereby waived the privilege and work product claim as to any document created at any date and time prior to the service of the Complaint on Defendants.

2.      The Court should order that Union Pacific shall be allowed to depose such additional number of witnesses and take such additional written discovery as the Court may determine is reasonable and required in light of Defendants' conduct and the Concealed Facts.

3.     The Court should enter its Order that Defendant Lone Star authorized, participated in, and ratified all conduct of Defendant Menjivar relevant to this Incident.

4.     The Court should enter its Order that Defendant Lone Star shall be bound by the testimony of its designated Rule 30(b)(6) witness Russell Powers and Rafael Menjivar given in Houston May 21-22, 2013.

5.     The Court should enter its Order that Defendant Lone Star shall produce in Albuquerque properly and fully prepared Rule 30(b)(6) witnesses on the topics Defendant Lone Star designated for Rafael Menjivar (topics 1, 2, 3, 5, 13, 20, 23, and 27) and Russell Powers (topics 4, 7, 8, 10, 11, 12, 13, and 17), and that the prior Rule 30(b)(6) depositions will not be counted in considering the number of depositions or the time spent in those depositions by Union Pacific.

6.     The Court should Order Defendant Lone Star to pay for the attorneys' fees and costs associated with the first Rule 30(b)(6) depositions, including travel costs to Houston, and the attorneys' fees and costs associated with the follow up Rule 30(b)(6) depositions on the same topics, pursuant to Paragraph 5.

7.     The Court should award Union Pacific its attorneys' fees and costs incurred in briefing this Motion.

8.     The Court should enter such other sanctions against the Defendants as the Court may deem appropriate.[5]

_____

[5] To the extent it may appear appropriate after briefing and additional discovery,
    (a)     The Court should enter default judgment against Defendants on liability on Union Pacific's Second Amended Complaint [Doc. No. 46];
    (b)     The Court should dismiss with prejudice and strike Defendants' Counterclaims;
    (c)     The Court should dismiss and strike, and preclude admission at trial of any evidence on, Defendants' comparative fault defenses.

## II.

## THE RECORD AND THE LAW ESTABLISH
## THAT THE COURT SHOULD SANCTION DEFENDANTS.

As grounds for this Motion, Union Pacific states that the Defendants provided false, evasive, and incomplete disclosures, answers and responses to Plaintiff's written discovery and to deposition questions, and have engaged in a course of willful non-compliance with and disregard of their obligations under the Federal Rules of Civil Procedure, including without limitation, under Fed.R.Civ.P. Rules 26, 30, 30(b)(6), 33 and 34, and under this Court's Order [Doc. 39], and should be sanctioned under Fed.R.Civ.P. 37.

A.   **The Record as Known to Union Pacific, Prior to Its First Learning on May 23, 2013 of Defendants' Failure to Provide Discovery, Establishes Negligence by Defendants**

1.   *Overview of Defendants' Negligence.*

Defendant Lone Star conducts commercial trucking operations in 48 states, operating out of a single "company terminal" located in Fort Worth, Texas, and out of 11 other terminals located in various states.  Exhibit D, Excerpt of Russell Powers Deposition 60:2-10 (hereinafter, "Ex. D, Powers dep.").  The U.S. Department of Transportation shows Lone Star operates about 600 commercial trucks and employs about 600 commercial drivers.  Research of on-line court records demonstrates that Lone Star is a savvy and experienced litigant, frequently a party in trucking litigation.  Lone Star conducts trucking operations through what are called "900 drivers," based out of the Fort Worth operation, and its remaining trucking operations through what Lone Star likes to characterize as "independent owner operators," but which, as a matter of law, are Lone Star's employees.  Ex. D, Powers dep. 54:4-12.  *See* Federal Motor Carrier Safety Act Regulation ("FMCSA"), 49 C.F.R. 383.5.  Consequently, there can be no issue that Defendant Lone Star is legally responsible for the negligence of the Defendant Menjivar.  *See,*

*e.g.*, JSR, Stipulation 9, at 3 [Doc. 18].  Defendant Lone Star employed Menjivar from 2003 until about late December 2012 or January 2013, at which time it terminated him for safety violations. Ex. D, Powers dep. Powers 89:24-90:14.  Defendant Menjivar had a history of discipline and violations, Lone Star having placed him on probation in December 2011, and Defendant Menjivar having received his most recent discipline from the company on December 17, 2012, just two days prior to this accident.  Exhibit F, Deposition of Rafael Menjivar 258:24-259:6 (hereinafter, "Ex. F, Menjivar dep.).  Lone Star has employed Russell Powers since 1994.  It has employed him since 2007 as its Houston Terminal Manager.  Ex. D, Powers dep. 89:24-90:14. As Houston Terminal Manager, among other things, it was his job to supervise Defendant Menjivar and his other Terminal drivers.  Ex. D, Powers dep. 33:24-34:4.

### 2.    *Union Pacific's Discovery Conducted Prior to May 23, 2012 Establishes Defendants Were Negligent.*

On February 26, 28, 2012, Union Pacific served 179 Requests for Production on Defendants and 15 Interrogatories on Defendant Lone Star, and 21 Interrogatories on Defendant Menjivar.  On the basis of Defendants' responses to Union Pacific's written discovery, Union Pacific proceeded to notice depositions, fact and Rule 30(b)(6).  From the evidence provided to Union Pacific in Defendants' responses to this written discovery (which Union Pacific used to develop its deposition strategy and questions), Union Pacific was only aware of one Lone Star tractor-trailer rig, and its driver, Rafael Menjivar, and a single Rotaflex unit being transported in December 2012 along U.S. 285 northwesterly to EP Energy from Odessa, Texas to Utah.  This was because Lone Star's only disclosed facts in its written discovery to support its "one rig, one driver" defense theme, withholding the Concealed Facts that demonstrate an entirely different picture of what occurred between December 12 and 20, 2012.

Union Pacific's deposition witness selection and Rule 30(b)(6) topic parameters were based on what appeared to be the universe of relevant facts from what Union Pacific could glean from the pleadings and discovery responses – Lone Star's "one rig, one driver" defense theme. Defendants objected to aspects of the proposed depositions, which led to a hearing before the Magistrate on May 13, 2013. The Magistrate entered her Order of May 14, 2013 that required Defendants to put up certain witnesses for fact depositions and for Rule 30(b)(6) depositions to be conducted in Houston, Texas beginning on May 20, and further depositions and Rule 30(b)(6) depositions to be conducted in Albuquerque the week of June 3. *See* Order [Doc. No. 39]. Union Pacific deposed five (5) witnesses, two of whom were deposed both individually and as Lone Star designated Rule 30(b)(6) witnesses: Rafael Menjivar (the Lone Star driver who was terminated in December 2012 or January 2013); Russell Powers (Lone Star Houston Terminal Manager). (The other three witnesses, Felipe Alas, Erica Perez and Roberto Lugo were minor witnesses Union Pacific deposed for a cumulative total of only about three to four hours.)

From what Union Pacific knew, prior to May 23, 2012, based on the Lone Star written and deposition discovery (tailored and limited by Defendants), Defendant Menjivar, on December 18, 2012, was dispatched from Houston in his tractor-trailer rig to pick up a Weatherford Rotaflex 1100 oil and gas drilling unit to transport it from Odessa, Texas to Utah. Mr. Menjivar left Odessa, Texas at about 5:00 a.m. The tractor-trailer unit and load was overlength (85 feet) and overweight (120,000 pounds) and therefore was not "legal" to travel on most New Mexico highways (or the highways of other states), and could only do so under the strict terms of a Special Permit issued by the State of New Mexico (and the departments of transportation for the other states through which his unit was traveling). As the law requires it to, Lone Star had obtained a set of Special Permits for this tractor-trailer load over the route Mr.

Menjivar's unit would travel, from the departments of transportation of Texas, New Mexico, Colorado, and Utah.

Pursuant to N.M.S.A. § 66-7-413 and N.M.A.C. § 18.19.8, *et seq.*, a truck of the overlength and overweight specifications of the Lone Star truck Menjivar was driving could only move under Special Permit: ". . . movements may not be made on any highway . . . other than the highways designated by the special permit as the route of travel . . . ."  N.M.A.C. § 18.19.8.23A.   A Special Permit "*shall be voided*" if "movement is made on highways, roadways or streets other than those specifically noted on the special permit . . . ."  N.M.A.C. § 18.19.8.28A.   Furthermore, no vehicle operating under a Special Permit may travel in "inclement weather," which is defined as "snow; ice; fog; rain; dust or other weather condition which leaves visibility to less than 1,000 feet . . . or any weather condition which is determined by the Department, the State Highway and Transportation Department, the state police, or other law enforcement official to create a safety hazard."  N.M.A.C. §  18.19.8.7C.

Moreover, "the effect of voiding a special permit is the same as if no special permit had been issued and the violator, in addition to the charge of violation of the traffic laws of this state, will be subject to prosecution under the provisions of § 66-7-416, N.M.S.A. 1978 . . . ."  N.M.A.C. § 18.19.8.28B.   Additionally, a permitted vehicle must be "properly flagged," which "means that flags . . . colored red, fluorescent red or fluorescent orange and which are no less than 12 inches by 12 inches on any side . . . are [to be] affixed to the vehicle and load in accordance with the Motor Carrier Safety Act," and "the appropriate oversize load signs must be properly affixed on both the front and rear of the permitted vehicle."  "Overlength" . . . signs must be at last 5 feet by 12 inches high.  N.M.A.C. § 18.19.8.41, 42.  The Special Permit states

these restrictions on its face.  *See* Exhibit J.  Defendants admit that Mr. Menjivar's truck was not properly flagged.  Exhibit J.

As Exhibit L and the New Mexico Special Permit show, the permitted route in New Mexico required Mr. Menjivar to keep his unit on U.S. 285 northwesterly from Roswell and to connect from U.S. 285 to I-40 westbound, then to connect to I-25 northbound, then to U.S. 550 and to continue northward or northwesterly in New Mexico, on into Colorado and Utah.  The New Mexico Special Permit identified the "Restrictions," and stated that no movement was allowed "during inclement weather."  Restriction 2 states the same definition of inclement weather as does the N.M.A.C.  It also includes weather with wind speeds that reach 25 miles per hour or more.  Restriction 7 addresses the N.M.A.C. requirements for oversize load signs and flags.  Restriction 17 incorporates the N.M.A.C. conditions associated with the Special Permit including that routes are an integral part of the Special Permit and any violation renders the Special Permit null and void and subjects the permittee to prosecution or citations.  *See* Exhibit K.

Defendant Lone Star's "one unit, one driver" position includes asserting that it had no way of communicating with Defendant Menjivar except via cell phone and no way of tracking his vehicle's whereabouts after he left Odessa, Texas on the road to Utah, other than what cell phone communications may by chance occur, and had no obligation to communicate with Mr. Menjivar (or he with Lone Star) or to track or monitor his unit's whereabouts.  Defendant Lone Star's "one unit, one driver" position includes asserting that there was utterly no communication whatsoever with Defendant Menjivar from the afternoon of December 18 until after the accident occurred, after 1:20 p.m. New Mexico time December 19.  Lone Star's position is that this was perfectly permissible, that Mr. Menjivar was on his own.  Defendants' position is that it had no

idea where Mr. Menjivar was, whether he was on the route he was required to be on or not, and that it had no means of communicating with him nor any obligation to do so.

According to the admissions and testimony, Mr. Menjivar stopped his tractor-trailer unit on the morning of December 19, 2012 at a roadside rest area located approximately 31 miles north of Roswell.  Ex. F, Menjivar dep. 29:12-31:9.  From there, he supposedly used a Rand McNally road atlas "that suggested to him that he could take U.S. 54 to Interstate 40 . . . Mr. Menjivar proceeded onto N.M. 54."  Ex. C-2, Defendant Lone Star's Answer to Interrogatory No. 2.  Exhibit L is a map showing where Mr. Menjivar traced his route in his deposition and the route he says he followed is shown in pink.  His testimony demonstrates (if believed) that the route he followed was to take U.S. 285 from the rest area 31 miles north of Roswell, and drive northwesterly past Vaughn, New Mexico, and then to exit off of U.S. 54 (which travels southerly from that point) just west of Vaughn, and then to travel about 13 miles south on U.S. 54, and then to turn westerly on N.M. 3, and then onto the Union Pacific railroad – highway grade crossing just west of the U.S. 54-N.M. 3 intersection.  *See* Exhibit L.  The green outlined roadway on Exhibit L shows the course he was required by Special Permit to follow from Vaughn northwesterly on U.S. 285 to I-40, and from there westerly.  He did not follow this route. Mr. Menjivar's testimony includes that he decided to take this route when he was stopped at the truck stop north of Roswell.  Ex. F, Menjivar dep. 29:12-30:17.  Mr. Menjivar's testimony is contrary to what he knew his duties under the law were, and contrary to the objective of moving the load in a northwesterly direction toward Utah.  Other facts must exist to explain why he ended up on the tracks, *e.g.,* did Lone Star instruct him to divert from U.S. 285 and try to circumvent U.S. 285 or I-40 west of Vaughn, for weather or road conditions, or other conditions, or did another Lone Star driver do so?  Defendant Lone Star's position is that it "is a mystery"

why Mr. Menjivar drove where he did – a position that is not credible and is not permissible under the FMSCA.

Defendants admit that Mr. Menjivar's leaving the permitted route violated New Mexico law and Defendant Lone Star admits this violated company policy; that Defendant Menjivar was not allowed to exit from the permitted route on U.S. 285 southerly onto U.S. 54, and that once he did, the Special Permit became void and that he was required to stop his truck.  Ex. D, Powers dep. 18:21-19:18, 35:15-36:2, 37:8-12, 40:11-24, 41:2-12, 41:16-42:7, 42:21-43:7, 47:23-48:19, 50:6-14, 78:15-24, 93:22-94:3; Ex. E, Powers 30(b)(6) dep. 22:14-23:2, 33:21-23.  Defendant Lone Star admits that Mr. Menjivar was not permitted to move the truck again from where it stopped, unless and until a new permit was issued.  *Id*.  Defendant Lone Star admits that Defendant Menjivar's failure to call in and report his departure from the permitted route was also a violation of company policy.  *Id*.

Nonetheless, both Defendants contend that there was nothing wrong with Mr. Menjivar attempting to take his unpermitted, illegal 85-foot-long, 120,000-pound rig, lowboy trailer with only about 8 inches of ground clearance over the Union Pacific tracks after he turned westerly off of U.S. 54 onto N.M. 3.  *See* Exhibit L.  Defendants' denials ignore N.M.S.A. §§ 66-7-341B(3) which mandates that "a person shall not . . . enter a crossing if the vehicle being driven has insufficient undercarriage clearance to pass over the crossing."  It is not credibly disputed that the clearance underlying the lowboy and the pavement was only approximately 8 inches – and what occurred establishes there was insufficient undercarriage to pass over the crossing. Consequently, it is uncontestable that Defendants violated this law.  Defendants' denial also ignores N.M.S.A. § 66-7-344A, which states that "no person shall . . . move . . . any equipment . . . having a . . . load clearance of less than one half inch per foot of the distance between any

14

two adjacent axles or, in any event, of less than 9 inches, measured above the level surface of the roadway, upon or across any tracks at a railroad crossing . . ." without first complying with the remaining portions of the statute (which is undisputed Defendants did not).  *See also St. Louis Southwestern Railway Company v. Pierce*, 68 F.3d 276, 278 (8th Cir. 1995) (Under the identical statute in Arkansas, "lowboy" semitrailer held to be "equipment" under railroad grade crossing statute requiring advance notice to railroad before crossing).  As Lone Star Houston Terminal Manager Russell Powers was forced to admit in his deposition, there are 45 feet between the last drive axle and the first trailer axle, meaning that, under the statute, 22 inches of clearance would be required (45 feet x ½ inch).  Ex. D, Powers dep. 78:15-24.  It is undisputed the Lone Star trailer did not have the required clearance.  Again, it is uncontestable that Defendants violated this law.

Defendants admit that Mr. Menjivar drove the tractor-trailer unit westward off of U.S. 54 onto N.M. 3, and that the trailer had insufficient clearance to pass over the crossing and ran aground of the asphalt roadway surface to the east of the railroad tracks.  *Id*.  Defendants admit that the Lone Star tractor-trailer unit remained in that position for 15 to 20 minutes before the incident occurred.  There also is no dispute that although Mr. Menjivar had an operating cell phone with signal (and made at least one telephone call to another Lone Star driver), he never called the Union Pacific "1-800" emergency number that was displayed on the signal shed just to the north of his vehicle at the crossing, and he never called 911.

A 2,876 ton, 4,093-foot-long Union Pacific train consisting of 4 locomotives and 47 cars, was traveling northward (railroad eastward) from El Paso with the Engineer and Conductor in the lead locomotive.  Its speed was approximately 49 miles per hour as it approached the crossing before emergency brake application.  The train's speed was well below the Federal

Railway Administration permissible track speed for this Class V track on that day.  The Union Pacific train crew applied the train's emergency braking system at the earliest possible moment they could have, at a distance believed to be approximately 1500 to 1600 feet south of the crossing.  The train, because of its weight and speed, was not able to come to a complete stop before impact.  The front of the lead engine, at about 29 miles per hour, hit the Lone Star tractor-trailer that was carrying the 58,000 pound Rotaflex unit bound for use by EP Energy in oil and gas operations in Utah.  There was an explosion and fire, extensive damage to Union Pacific's property, fire damage to Union Pacific's two lead engines, other damage, and, allegedly, injuries incurred by the Union Pacific crew.[6]  *See* Second Amended Complaint [Doc. No. 46].  *See* Exhibit M.

Union Pacific sued Defendants on December 20, 2012.  Given these admitted or essentially undisputed facts, Union Pacific respectfully submits that whether Defendants were negligent is not debatable, nor is it debatable that Lone Star is liable for Mr. Menjivar's negligence.  It also is not debatable that Union Pacific incurred substantial damages as a result of the collision.

> **B.     The EP Documents That Disclose the Concealed Facts Demonstrate Defendants Failed to Provide Discovery as the Rules Require.  The Concealed Facts Suggest Defendants' Discovery Responses Have Been Designed to Prevent Disclosure of Rule 26 Discoverable Facts to Avoid Entry of a Judgment for Punitive Damages.**

Plaintiff did not know or have any reason to believe until May 23, 2012, after returning to New Mexico when Plaintiff's counsel began reviewing 317 pages of Lone Star documents produced via subpoena issued by Plaintiff to EP Energy the day before, that the Lone Star "one rig, one driver" defense theme presented is a false one and that Defendants gave false,

---

[6] The crew since has sued Union Pacific and Lone Star for personal injuries in state district court in El Paso, Texas. Union Pacific denies the crew was injured.

misleading, and incomplete discovery responses to hide this.  The Concealed Facts discovered by the EP documents establish that the Lone Star Menjivar tractor-trailer was only one of a 12-truck Lone Star tractor-trailer convoy or convoys of essentially identical lowboy units that between roughly December 15 and 20, 2012 were transporting by Special Permits identical 58,000 pound Rotaflex units and related equipment from Odessa, Texas to EP Energy in Utah.  The Concealed Facts disclose a number of these other virtually identical Lone Star rigs apparently were on the same route as Menjivar's Lone Star truck was on during December 18-19, 2012, and that the convoy(s) had run into snow and ice and adverse weather conditions in New Mexico, that New Mexico law enforcement was issuing citations to Lone Star drivers (presumably for violating the restrictions on the permits that preclude driving in adverse weather conditions), and that New Mexico law enforcement was closing or threatening to close the roads and highways that the Lone Star convoy trucks were traveling over on their trip to Utah.  *See, e.g.,* Appendix to Exhibit A-2, Tabs 3-19.  Union Pacific was also not aware, nor could it have been, of the many other facts that the EP documents demonstrate, that are contrary to and not disclosed by Defendants' responses to written requests for production, interrogatories and answers to deposition questions. *Id.*, Tabs 20-52.  These facts only began to be disclosed to Plaintiff through the EP Energy subpoenaed production, when Plaintiff's counsel first reviewed them on the afternoon of May 23, 2013.

Union Pacific submits that the ground Lone Star has tried to cover up in discovery, and is refusing to cede, is that which may lead to an award of punitive damages: Lone Star knew of, authorized, and ratified Mr. Menjivar's conduct and participated in that conduct.  Union Pacific submits what underlies Defendants' discovery practices at issue in this Motion are Lone Star's efforts to avoid discovery of such facts that may lead to an award of punitive damages. The

Concealed Facts and documents appear to establish or lead to such facts, and to place this Incident in an entirely different light.  The Concealed Facts suggest that Lone Star's essential defenses, that it did not know, had no reason to know, and did not need to know  where Mr. Menjivar's unit was, that it had no reason to know he had left the permitted route, that "it is all a mystery," and that Lone Star did not know he was or why he would have been diverting to the south on U.S. 54, that it could not have known his unit's location, and that it had no duty to track him.  Lone Star's "mystery" defenses are very much put in issue by what appears to have been a very different picture than Mr. Menjivar's actions taken alone would portray.  The Concealed Facts indicate that there was a convoy of perhaps a dozen Lone Star units essentially identical to Mr. Menjivar's, at least some of which appear to have been traveling with Mr. Menjivar's, all moving the same very important Rotaflex units of great value along the same route to a long-standing, valuable customer, EP Energy, on a tight schedule; that in New Mexico there was bad weather, bad roads, citations being given to other Lone Star drivers for moving in inclement weather, that roads were being closed, that Lone Star knew perfectly well where its convoy of trucks was located and their ETAs to Utah; that Russell Powers and others conducted investigations and had communications that Defendants' discovery responses deny occurred or existed.

Defendants' written discovery responses did not disclose the identity or existence of other key witnesses in Houston that the EP documents disclose and they concealed responsive documents and facts.  The EP documents show that Mr. Powers made false and misleading statements in his deposition.  Mr. Menjivar is believed to have made a number of statements that were, at least, misleading, and, depending on what further discovery shows, may have also been false.  Amplifying Defendant Lone Star's discovery abuse is that each of these two Houston Rule

18

30(b)(6) witnesses admitted they had done nothing to prepare for the Rule 30(b)(6) testimony;

had spoken to no one or virtually no one to obtain company information; had reviewed no, or

essentially no, documents to prepare for their Rule 30(b)(6) testimony; and had no basis to testify

as to the corporate knowledge and were unprepared and uninformed and lacked the knowledge to

testify as to the corporate knowledge or position on the Rule 30(b)(6) topics on which Defendant

Lone Star had designated for them (in several instances as the *sole* corporate representative).

Accordingly, the Court should enter sanctions.

   **C.    Lone Star's Responses to Union Pacific's Requests for Production Fail to
          Identify EP Documents Within the Scope or Other Documents Within the
          Scope That Would Disclose the Same or Related Facts.**

Exhibit A-2 is a chart that identifies by sequential Tab number, EP Bates number, time

and date, and general description, in chronological order, the universe of EP documents EP

Energy produced pursuant to subpoena to Union Pacific on May 22, 2013.  Exhibit A-1 refers to

certain of the EP documents by the same sequential Tab numbers as in Exhibit A-1, and

chronological order, and identifies them by date and time, and provides a much more detailed

description of content, and some narrative concerning their importance.   The Appendix to

Exhibit A-2 sets forth the selected EP documents, in Tab number order.   These Exhibit A-2

selected EP Energy documents establish Defendant Lone Star's failure to provide discovery to

Union Pacific.

Exhibit B-1 compares selected Union Pacific Requests for Production of Documents, by

number, to the Lone Star Responses thereto, and emphasizes in bold faced, bracketed text in the

right-hand column examples of responsive EP documents referred to in Exhibit A-2 by Tab

number that Lone Star should have produced and disclosed in its Responses, but did not.  (Nor

did Lone Star produce other documents disclosing the same or related facts that are referred to in

the EP documents.)    The full text of the relevant Union Pacific Requests for Production and Responses are attached as Exhibit B-2.

Union Pacific requests that the Court compare the descriptions in Exhibit A-2 (and also refer to the full text of the Tabbed Appendix Exhibit A-2 Lone Star documents appearing following the Exhibit B-1 chart to the Requests).  Union Pacific submits that Lone Star could not have inadvertently failed to identify or produce these documents in response to the subject Requests for Production.  To illustrate this, by way of brief overview, the Tab 1 Alliance Agreement of May 29, 2002 between EP Energy and Lone Star appears to form the contractual basis for an ongoing ten-year plus agreement for Lone Star to transport oil and gas equipment to EP Energy.  This includes the shipment by Lone Star to EP Energy of the 58,000 pound Menjivar / Rotaflex unit from Odessa, Texas, to Utah in December 2012, as well as the Rotaflex units on the other Lone Star tractor-trailer units comprising the convoy or convoys that appear to have traveled the same route across New Mexico, from Odessa, Texas, on the way to Utah. They almost certainly followed the same northwesterly route (U.S. 285) across New Mexico in the vicinity of Vaughn that the Menjivar unit did.  Tabs 3 through 10 are replete with information about the planning for the EP Energy Rotaflex unit shipments, the number of trucks in the convoy or convoys (twelve), the Menjivar unit (called Unit CT-13534 in the EP documents – see Tab 14, which identifies in chart form all twelve units) and they establish that essentially the same Lone Star tractor-trailer lowboy units carrying the same 58,000 pound Rotaflexes as Menjivar's unit did were being moved by Lone Star from Odessa, Texas, to Utah on December 18-19 (and perhaps at earlier or later dates).  Tab 10 raises the strong inference that these units were crossing New Mexico at about the same time as Mr. Menjivar was when, to Union Pacific's understanding, there was bad winter weather (snow, ice and winds) and corresponding road

closings in the vicinity of U.S. 285 and I-40. The Tab 10 EP document shows Lone Star's units were running into bad weather, roads were being shut down, and that some of the Lone Star trucks were being fined (presumably for violating the Special Permit conditions concerning inclement weather). Tabs 10 through 15 establish that the trucks in the convoy likely were traveling under known locations and ETAs, contrary to the testimony of Russell Powers (see below). Tab 15 suggests that on the morning of December 20, four Lone Star trucks that likely had been traveling across New Mexico on December 19, had advanced to between 15 and 130 miles from the destination in Utah to which they and Mr. Menjivar were bound (prior to the Incident occurring on December 19 at about 1:20 p.m.). This may be evidence that these four trucks were traveling in convoy with him, and that they had all experienced the same inclement weather. If so, the inference arises there may have been CB or cell phone or text or other communications between these truck drivers and Mr. Menjivar, communications between Lone Star and the other drivers, and instructions from Lone Star to the drivers. Tabs 16 through 27 reflect numerous communications about the Incident. Tab 19 is a December 21, 2012 e-mail from Russell Powers (that his testimony denies exists) that refers to an "all-day event/meeting at corporate office" on December 20 about the Incident, that Powers sent to the large team of people involved in the transportation of the Rotaflex units and who were involved in determining the effect of the Incident on deliveries. Mr. Powers states in Tab 19 "will relay to all more details this A.M." Issues about claims, presumably under the Lone Star Travelers' insurance policy (also not disclosed) or some other policy, and related investigations arise in late December 2012, and thereafter there are numerous e-mails concerning investigation of the Incident, the damages, the developing dispute between EP Energy and Lone Star, and the involvement of senior management of Lone Star, culminating with a May 10, 2013 demand from EP Energy to

21

Lone Star to pay $160,733.27.  *See* Tabs 23-52.  Union Pacific provides the Court with further information and a narrative about these EP documents in Exhibit A-2 so the Court may more easily determine the responsiveness of these documents to the Union Pacific Requests for Production 29, 39, 42, 43, 58, 68, 77, 78, 80, 98, 140, 142, 143, 153 and 177.

Accordingly, Union Pacific respectfully submits that the EP documents that are identified in the Tabs in Exhibit A-2 establish Defendant Lone Star's willful failure to provide discovery, in contravention of its obligations under the Rules.[7]  Given the ten-year plus business relationship with EP Energy, the importance of that business to Lone Star, the number of Lone Star, EP Energy, and manufacturer (Weatherford) personnel involved in examining the Incident and the effect on EP Energy's operations, the investigations that occurred, and analysis of these issues at the highest levels of Lone Star, including possibly by its senior executive, Tex Robbins, it is implausible that Lone Star inadvertently failed to disclose those documents and facts.

**D.  Lone Star's Answers to Union Pacific's Interrogatories Verified by Donna Stone Fail to Disclose Facts Referred to in the EP Documents.**

Exhibit C-1 shows that Union Pacific Interrogatories 1, 3, 4, 13, and 14 inquire into facts within Lone Star's knowledge, as is evident from the EP Energy documents, that Lone Star was required to disclose in its Answers to Interrogatories.  Again, if the Court will compare the Interrogatories and Answers with the EP documents referred to in the Exhibit A-2 Tabs, on the right-hand side of Exhibit A-2, the Court should find that Lone Star failed to provide discovery in its Answers to Interrogatories as well.  Donna Stone, Lone Star's Claims Director, verified these non-complying Answers.  The full text of the subject Answers to Interrogatories and her Verification are Exhibit C-2.  Accordingly, sanctions are appropriate.

---

[7] The admission of Russell Powers, Houston Terminal Manager, that he never received Union Pacific's Requests for Production and that neither he nor anyone in the Houston Terminal did "anything to assure Union Pacific got all the documents it requested."  Exhibit D, Powers dep. 16:5-12, 113:13-18.

**E.** **Mr. Powers' May 21-22, 2012 Deposition Testimony Contains False or Misleading Statements.**

The Court's Order required Defendant Lone Star to produce, among other witnesses, Houston terminal manager, Russell Powers, individually, and for Lone Star to produce its 30(B)(6) witnesses to the extent located in Houston.  Order [Doc. 39].  Lone Star designated Russell Powers as its Rule 30(B)(6) witness for Topics 4, 7, 8, 10, 11, 12, 13, 17, 27, Doc. 47. Union Pacific deposed Powers first individually (and then as a Rule 30(B)(6) witness).  Mr. Powers gave the following deposition testimony in his individual deposition on May 21-22, 2012:

| | | *Russell Powers' Deposition Testimony, May 21, 2012.  See* Exhibit D. |
|---|---|---|
| 1 | 8:20-24 | Q.  What – who else have you spoken to at any time from the date of this accident to the present day about anything concerning Mr. Menjivar or this accident, apart from Tracy [Jenks – legal counsel] on Saturday for about 30 minutes on the phone?<br>A.  Nobody other than Mr. Menjivar. |
| 2 | 9:11-9:24 | Q.  So, there's nothing you created electronically or in writing?<br>A.  No.<br>Q.  Who did you communicate what he told you about to?<br>A.  I just wanted to know as the terminal manager what all took place and what happened.<br>Q.  Who did you tell about that?<br>A.  Nobody.<br>Q.  You didn't tell Mr. Powers – excuse me.  You didn't tell Mr. Cooney?<br>A.  No.<br>Q.  Or anybody else?<br>A.  No. |
| 3 | 13:18-23 | Q.  And then as I understand it, the only person you've spoken with about this apart from counsel – and we discussed those meetings – is Mr. Menjivar, and that was on the Monday or Tuesday after the accident for about 30 minutes at the terminal?<br>A.  Correct. |
| 4 | 15:23-16:4 | Q.  Okay.  The – so, let me go back, then.  You took no notes of the conversation?<br>A.  No.<br>Q.  You never told anybody about what he said?<br>A.  No.<br>Q.  Except counsel?<br>A.  Correct. |

| | | *Russell Powers' Deposition Testimony, May 21, 2012.  See* Exhibit D. |
|---|---|---|
| 5 | 17:24-18:4 | Q.  So, what did you do as the man in charge of this termination [of Rafael Menjivar's employment] as Lone Star's manager to figure out how this accident happened?<br>A.  Asked Rafael.<br>Q.  That's it?<br>A.  That was it. |
| 6 | 18:18-20 | Q.  You've done nothing else to determine how this happened?<br>A.  Nothing else to determine. |
| 7 | 19:19-22 | Q.  And so it's clear, you have not communicated with anyone else except Mr. Menjivar and Ms. Jenks about this incident?<br>A.  Correct. |
| 8 | 95:5-18 | Q.  Was Mr. Menjivar trying to avoid New Mexico DOT or state police between Vaughn and Encino, New Mexico, on 285.<br>MS. JENKS:  Object to form.  Objection to foundation.<br>A.  That should be to Mr. Menjivar.<br>Q.  (By Mr. Atkinson)  You don't know, and the company doesn't know?<br>A.  No.<br>Q.  And you have no way of finding that out?<br>A.  No.<br>Q.  And what have you done to try to find that out?<br>MS. JENKS:  Object to form.<br>A.  I haven't even raised that question. |

| | | *Russell Powers' Deposition Testimony, May 22, 2013.  See* Exhibit E. |
|---|---|---|
| 9 | 112:7-10 | Q.  (By Mr. Atkinson) What has the involvement of your terminal been in connection with investigating circumstances of this accident?<br>A.  None. |
| 10 | 223:21-24 | Q.  Have you been asked by anybody to find out why this accident happened?<br>A.  No. |
| 11 | 235:24-<br>236:18 | Q.  As a terminal manager it's not your job to find out why one of your drivers got hung up on a crossing and got hit by a train resulting in millions of dollars of property damage and injury to two crew members?<br>A.  No, it's not my job to investigate it.  That's what you asked me.<br>Q.  No, I said – I said, "Have you investigated?"  You said no.<br>     All right.  Is it your job to know that, to know what happened?<br>A.  You asked me if I investigated it and I said no and you said why not.<br>Q.  And you said it's not your job?<br>A.  Correct.<br>Q.  And I said, "So, it's not your job to find out why one of your drivers got hung up on a crossing and got hit by a train and resulted in millions of dollars of property damage and injury to two crew members?"  Is that what you're telling me? |

| | | **Russell Powers' Deposition Testimony, May 22, 2013.  See Exhibit E.** |
|---|---|---|
| | | A.  Yes. |
| 12 | 236:19-22 | Q.  Well, how do you believe this accident happened?<br>A.  I really don't know.<br>Q.  It's a mystery?<br>A.  Mystery. |

The Russell Powers' testimony identified in Paragraphs 1, 2, 3, 4, and 7 above is demonstrably false or misleading.  EP documents at Tab Nos. 11, 12, 17, 19, 22, and 24 establish this.  These EP documents establish, contrary to Powers' sworn testimony, that Powers spoke to persons other than Mr. Menjivar and Ms. Jenks "concerning Mr. Menjivar or this accident," establish that he wrote a number of e-mails on the topics, and that he told others "about what [Menjivar] said," and has "communicated [extensively] with [others] . . . about this incident" (including at a high level Lone Star meeting on December 20, 2012 and, inferentially, with Tex Robbins, owner and President).  The "others" include at a minimum EP Energy, Weatherford, and other Lone Star personnel.  (EP documents Tab No. 17 refers to a request of Russell Powers to give Barton of EP a call "and discuss the accident."  If this call occurred, it would be contrary to Russell's sworn testimony as well.)

Mr. Powers' testimony referred to in Paragraphs 5, 6, 8, 9, 10, 11 and 12 appears to be at least misleading.  EP documents at Tab Nos. 3-8, and 10-25 establish or suggest this, referring to knowledge by Mr. Powers, *e.g.*, of the convoy or convoys, the routes followed by the Lone Star trucks, communications to determine truck ETAs and locations, and efforts by him and his Terminal employees to determine how the accident occurred.

Union Pacific submits this testimony establishes that sanctions are appropriate.  Mr. Powers is the Lone Star Houston Terminal Manager, the senior most manager in Houston, whose job included making these shipments and supervising and monitoring the drivers on the convoy

or convoys traveling to Utah.  The EP Energy–Lone Star contractual relationship extends back over ten years before this Incident, and represents significant business for Lone Star and for the Houston Terminal.  EP Energy was pressing Lone Star for on time deliveries between December 12 and 25, 2012, and Mr. Powers was responsible for meeting those requirements.  EP Energy post-Incident pushed hard to determine what happened to and recover its damages for the destroyed/replacement Rotaflex unit.  Lone Star produced Mr. Powers for deposition as the highest ranking member of management with the greatest knowledge of Houston Terminal operations, overseeing shipments, dispatching, supervision of drivers, and fulfillment of the customer's orders.

Union Pacific, by sheer effort, has managed to discover what Defendants have concealed–what may be only the tip of the iceberg of concealed information.  Mr. Powers' testimony above demonstrates he cooperated with what appears to be a concerted effort by Lone Star to keep Union Pacific from going behind the "one Lone Star tractor-trailer unit headed to Utah, driven by a driver who inadvertently and mysteriously, and unbeknownst to Lone Star, got off the permitted route and somehow got on the tracks" theory Lone Star advances as its theme of defense.  The EP Energy documents suggest an entirely different scenario – one in which Lone Star had much greater knowledge of the situation on the roads and routes on December 18-19, and perhaps of Mr. Menjivar's whereabouts and reasons for leaving U.S. 285, including perhaps that Lone Star or other drivers directed him to go south on U.S. 54 and westerly on N.M. 3 to attempt to avoid law enforcement or road closures or inclement weather on U.S. 285 and I-40.  These facts, if proven, would support Union Pacific's punitive damages claims.  Accordingly, the Court should enter the appropriate sanctions to require Defendants' compliance with the Rules and to allow Union Pacific to discover the full set of facts to present at trial.

**F.      Defendant Lone Star Failed to Produce Fully Prepared and Informed and Knowledgeable Rule 30(b)(6) Witnesses.**

Despite this Court's Order [Doc. 39] to produce its Houston Rule 30(b)(6) witnesses, and despite the requirements of Rule 30(b)(6), Defendant Lone Star, on May 21-22, 2013, knowingly produced wholly unprepared, unknowledgeable and uninformed Rule 30(b)(6) witnesses.  Judge Browning's decision in *Skyline Potato Company, Inc. v. Tan-O-On Marketing, Inc.*, 2012 WL 3150385 (D.N.M. July 30, 2012)(Browning, J.) sets out the obligations of the designating party and its Rule 30(b)(6) witnesses in this District at length.

Rule 30(b)(6) of the Federal Rules of Civil Procedure provides:

> A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. A subpoena shall advise a non-party organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization. This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules.

> Fed.R.Civ.P. 30(b)(6). "*Under Rule 30(b)(6), when a party seeking to depose a corporation announces the subject matter of the proposed deposition, the corporation must produce someone familiar with that subject.*" *Reilly v. Natwest Mkts. Grp. Inc.,* 181 F.3d 253, 268 (2d Cir.1999). "To *satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available 'such number of persons as will' be able 'to give complete, knowledgeable and binding answers' on its behalf.*" *Reilly v. Natwest Mkts. Grp. Inc.,* 181 F.3d at 268. *Accord Gulfstream Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp.,* No. 06–1165, 2007 WL 5704041, at *5 (D.N.M. Oct.24, 2007)(Browning, J.) ("*A corporation must prepare its designated representative to provide complete, knowledgeable, and binding answers on the corporation's behalf.*"). "The purpose behind designating a witness to represent the corporation is to prevent bandying, which is the practice of presenting employees for their depositions who disclaim knowledge of the facts known by other individuals within the organization." *Gulfstream Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp.,* 2007 WL 5704041, at *5 (internal quotation marks omitted)." *See Skyline* at *5-*6. [Emphasis supplied.]

At 4:58 local time, May 20, 2013 (Doc. 47), contrary to counsel's previous representations the week prior, Lone Star designated Defendant Menjivar as its sole corporate designee on Rule 30(b)(6) topics 1, 2, 3, 5, 20 and 23 (Doc. 47).  Mr. Menjivar was also designated a corporate representative, along with other individuals on topics 13 and 27.  At the same time, Lone Star also designated Terminal Manager Russell Powers as its sole designee on topic 4 and as a partial designee on topics 7, 8, 10,11, 12, 13, 17, and 27 (Doc. 47).  Despite being designated by Lone Star as corporate representatives, neither Mr. Menjivar nor Mr. Powers were prepared, knowledgeable, or informed about the topics.  Specifically, among other things, Mr. Menjivar conceded in his deposition at 9:00 a.m. on May 21, 2012 as follows:

| Menjivar 30(b)(6) Deposition | |
|---|---|
| 25:23-25 | Q.  All right.  Why are you being deposed this morning, today, to your understanding?<br>A.  I don't know. |
| 26:13-15 | Q.  Well, what subjects have you been prepared on under Rule 30(b)(6)?<br>A.  I haven't prepared at all. |
| 27:6-23 | Q.  And we finished about 7:30 last night.  So, when did you first learn that you were going to be testifying as the 30(b)(6) representative for Lone Star on certain topics?<br>A.  The attorney notified me that that would be now.<br>Q.  And what time last night were you notified of that?<br>A.  Last night after we left here.<br>Q.  Yes, sir.  We left here about 7:30.  My question is: What time after 7:30 did you learn that?<br>A.  Last night she just mentioned that today – in the morning – I would be asked questions, yes.<br>Q.  Well, Exhibit 49 is the Rule 30(b)(6) notice of deposition.  So, tell me, please, what topics you are prepared to provide Rule 30(b)(6) testimony on on behalf of Lone Star.<br>A.  I've not prepared at all.  It's the same thing.  Whatever questions you ask, I'm going to try to answer. |
| 28:3-11 | Q.  Have you been told what subjects you would be testifying about as a Rule 30(b)(6) witness for Lone Star?<br>A.  No. |

| | |
|---|---|
| | Q.  What materials were you given to assist you to be a Rule 30(b)(6) designee today? <br> A.  Not one document. |
| 28:25-29:11 | Q.  So, you did not have any discussions with anybody to prepare your ability to testify as to the corporate knowledge of Lone Star about the designated topics? <br> MS. JENKS:  Object to the form. <br> A.  Correct.  I've seen nothing about what this is going to be about. <br> Q.  (By Mr. Atkinson)  You haven't talked with any Lone Star witnesses or Lone Star employees or Lone Star officers to be able to answer the 30(b)(6) questions that you have been identified for today? <br> MS. JENKS:  Object to the form. <br> A.  No. |
| 29:12-16 | Q.  (By Mr. Atkinson)  And you haven't taken any notes about information you've obtained from documents or conversations to assist you in testifying as a 30(b)(6) witness today? <br> A.  No. |

Mr. Menjivar was further unable to provide any testimony as to Lone Star's knowledge or position with respect to topics 1, 2, 3, 13, 20, 23 for which Lone Star designated him as the sole company representative.  *See* the more complete summary of Mr. Menjivar's failures to properly prepare for and respond to Rule 30(b)(6) deposition questions attached as Exhibit N.

Mr. Powers likewise admitted in his deposition to being unprepared and uninformed and lacking knowledge as well.  Specifically, Mr. Powers conceded:

| Powers 30(b)(6) Deposition | |
|---|---|
| 8:11-19 | Q.  You've also been named a 30(b)(6) witness on certain topics, and we're going to take that deposition following your individual deposition. <br>      What have you done to prepare for that deposition? <br> A.  Nothing, other than being told I was a 30(b) – I was going to be deposed on a 30(b). <br> Q.  30(b)(6)? <br> A.  (b)(6), yes. |
| 9:1-5 | Q.  And you have not checked with anybody else in the company to obtain the company's knowledge on the topics identified as your topics under this notice; is that correct? <br> A.  Correct |
| 12:5-14 | Q.  (By Mr. Atkinson)  All right.  Mr. Powers, in regard to the paragraphs you identified, tell us what you did to obtain the corporate knowledge of Lone Star on any of those topics. <br> A.  Nothing. |

| | |
|---|---|
| | Q.  Nothing?<br>A.  No.<br>Q.  Why not?<br>A.  I didn't see the need to acquire any knowledge.  I assumed I had it. |
| 13:2-9 | Q.  Did you do anything to obtain the institutional knowledge on the topics that we have identified that you have referred to in your testimony?<br>A.  And what would be my institutional –<br>Q.  Knowledge of Lone Star Transportation.<br>A.  I took that as my knowledge.<br>Q.  Not the corporate knowledge, correct?<br>A.  Correct |

Like Mr. Menjivar, Mr. Powers was unable to provide testimony on behalf of the company on his designated topics.  See Exhibit N.

Here, it is undisputed that neither of Lone Star's designated corporate representatives were prepared, knowledgeable or informed.  The federal rules call for the imposition of sanctions when a party fails to meet its obligations under Rule 30(b)(6).  *Starlight International, Inc. v. Herlihy*, 186 F.R.D. 626, 639 (D. Kan. 1999) (Fed.R.Civ.P. 37(d) permits the imposition of sanctions when a party or person designated under Rule 30(b)(6) fails "to appear before the officer who is to take the deposition, after being served with proper notice." "Producing an unprepared witness is tantamount to a failure to appear at a deposition." *United States v. Taylor*, 166 F.R.D. 356, 363 (M.D.N.C.), *aff'd,* 166 F.R.D. 367 (1996). Corporations, partnerships, and joint ventures have a duty to make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter. *Cf. Dravo Corp. v. Liberty Mut. Ins. Co.,* 164 F.R.D. 70, 75 (D.Neb.1995) (corporations). If the designated persons "do not possess personal knowledge of the matters set out in the deposition notice, the [entity] is obligated to prepare the designees so that they may give knowledgeable and binding answers for the [organization]." *Taylor,* 166 F.R.D. at 361. "[I]f it becomes obvious during the course of a deposition that the

designee is deficient, the [organization] is obligated to provide a substitute." *Dravo,* 164 F.R.D. at 75). "[I]nadequate preparation of a Rule 30(b)(6) designee can be sanctioned based on the lack of good faith, prejudice to the opposing side, and disruption of the proceedings." *Taylor,* 166 F.R.D. at 363. The mere fact that a party later has opportunity to again depose the representative does not cure the initial inadequacy of the witness. *See id.*

Here, Defendant Lone Star violated the Court's Order [Doc. 39] and, as a matter of law, neither of these designees "appeared" at the depositions. Sanctions are appropriate. *See* Fed.R.Civ.P. 37(d).[8]

### G. Defendants Failed to Produce a Privilege Log.

Despite asserting a privilege claim in response to several of Union Pacific's Requests for Production (*e.g.,* RFP Nos. 43, 58, 143), Lone Star and Menjivar failed to provide a privilege log and therefore have waived any asserted privilege claim. As Judge Lynch explained in *Tom*, the failure to produce a privilege log together with an initial discovery response or objection is "effectively waiving the objection." *Tom* at 18 and authorities cited therein. Here, Lone Star's failure, despite demand, to serve a privilege log is tantamount to waiving any objection on the basis of privilege. As a result, Lone Star has no basis for refusing to disclose and failing to produce documents it asserts were privileged between the date of the accident and service of the Complaint. Accordingly, Lone Star should be sanctioned for its improper objection and ordered to produce all responsive documents and overruling any claim of privilege created prior to service of the Complaint.

---

[8] Defendant Lone Star nonetheless is bound by their designees' testimony, even if shown to have been uninformed. Union Pacific may utilize their Rule 30(b)(6) testimony as evidence of Lone Star's knowledge and position, or lack thereof, and as impeachment at trial. *Pedroza v. Lomas Auto Mall, Inc.*, 2009 WL 1325440 (D.N.M. 2009).

**ELECTRONICALLY FILED:**

ATKINSON, THAL & BAKER, P.C.

*/s/  Clifford K. Atkinson*
Clifford K. Atkinson
Justin D. Rodriguez
201 Third Street NW, Suite 1850
Albuquerque, NM  87102
Tel (505) 764-8111
Fax (505) 764-8374
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

We hereby certify that on May 29, 2013, we filed the foregoing electronically through the

CM/ECF system providing notice to all counsel of record.

*/s/ Clifford K. Atkinson*
Clifford K. Atkinson